ABM ESCROW CLOSING AND CON-
SULTING, INC., Petitioner,

v.

MATANUSKA MAID, INC., Respondent.

No. 6457.

Supreme Court of Alaska.

Feb. 18, 1983.

Harold W. Tobey, Michael Dundy, Bogle & Gates, Anchorage, for petitioner.

Eric L. Hanson, Abbott, Lynch & Farney, Anchorage, for respondent.

Before BURKE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

### I. *Background.*

A petition for hearing was granted in this matter to consider an appellate decision of the superior court. The superior court, re-

versing the district court, held that ABM Escrow Closing and Consulting, Inc. (ABM), which handled the sale of an Anchorage A & W restaurant, is liable to one of the restaurant's creditors for failing to pay that creditor's account from the proceeds of the sale of the restaurant. The issue before us is whether Article 6 of the Uniform Commercial Code (Bulk Transfers)[1] applies, directly or by estoppel, to the sale of the restaurant. We conclude that it does not, and accordingly we reverse.

In early 1979, ABM acted as escrow agent for the sale of an A & W restaurant. The restaurant's sellers gave ABM a list of the restaurant's creditors, one of which was respondent Matanuska Maid; ABM then sent the named creditors a notice which is the center of controversy in this case. The notice provided in pertinent part that "[t]his is to give notice as required by the Alaska Statutes governing Bulk Sales that a bulk transfer of the [restaurant] is about to be made. . . . All debts of the transferors are to be paid in full. . . . All bills should be sent to ABM. . . ." Matanuska Maid received a copy of this notice on January 29, 1979 but did not contact ABM until almost five months later.

Between April 13, 1979 and May 1979, ABM paid all the debts of the restaurant's other creditors and apparently disbursed the remaining sale proceeds to the sellers. On June 20, Matanuska Maid's controller contacted ABM to inquire about payment; ABM informed him that the sale proceeds had long since been disbursed. Matanuska Maid then sued ABM and the sellers for the amount of the debt, about $1,600; only ABM's liability is at issue on review.[2]

Matanuska Maid argues that ABM is liable for the debt because Article 6 required that the debt be paid from the proceeds of the sale of the restaurant. Alternatively, Matanuska Maid contends that if Article 6 does not of its own force require payment,

---

1. AS 45.06.101–.111.

2. Matanuska Maid dismissed its claim against one of the sellers at the beginning of trial; its claim against the other seller was stayed because the seller had instituted bankruptcy pro-

ceedings. *See* 11 U.S.C. § 362(a)(1). Matanuska Maid has not pursued any claim against the restaurant's purchasers, the parties who would be primarily liable should Article 6 apply to the transaction involved in this case.

the requirements of the Article nonetheless are applicable by estoppel because ABM's notice to creditors expressly stated that notice was being given "as required by the Alaska Statutes governing Bulk Sales."

After a bench trial, the district court ruled in favor of ABM; on appeal the superior court agreed with the district court that Article 6 is not applicable to the sale of a restaurant, but concluded that ABM nonetheless was liable because Article 6 applied by estoppel.

## II. *Article 6 and Sales of Restaurants.*

■ Article 6 applies to "a transfer in bulk and not in the ordinary course of the transferor's business of a major part of the [business's] materials, supplies, merchandise or other inventory"[3] if the enterprise is one "whose principal business is the sale of merchandise from stock."[4] If a transfer is within the purview of Article 6, the buyer must obtain a list of the business's creditors from the seller and give those creditors notice of the pending transfer. In addition, Alaska, unlike many states, has adopted a further provision which gives creditors the right to be paid from the proceeds of the transfer.[5] In our view, however, the requirements of Article 6 are inapplicable in this case because the sale of a restaurant is not the kind of transaction to which Article 6 is intended to apply.

■ We note first that the official comments accompanying Article 6 expressly state that restaurants are excluded from the Article.[6] Although the official comments are not necessarily controlling in interpreting the scope and intent of the Uniform Commercial Code provisions, they are "of persuasive assistance" in construing and applying the Code. *Morrow v. New Moon Homes, Inc.,* 548 P.2d 279, 287 n. 24 (Alaska 1976).

Second, virtually every court that has considered the question has concluded that Article 6 does not apply to sales of restaurants.[7] Although precedent from other jurisdictions is, of course, not binding upon us, we nonetheless are mindful of the fact that a basic objective of the Uniform Commercial Code is to promote national uniformity in the commercial arena and that this objective would be undermined should we decline to follow the stated intent of the Code's drafters and the reasoned decisions of a number of other jurisdictions.

Finally, and most importantly, we conclude that Article 6 is inapplicable because the evils that the article is intended to prevent are not present in this case.

■ In general, Article 6 is designed to protect unsecured trade creditors from the possibility that an unscrupulous merchant

---

**3.** AS 45.06.102(a).

**4.** AS 45.06.102(c).

**5.** AS 45.06.106.

**6.** The businesses covered are defined in subsection (3) [AS 45.06.102(c)]. Notice that they do not include farming nor contracting nor professional services, nor such things as cleaning shops, barber shops, pool halls, hotels, *restaurants,* and the like whose principal business is the sale not of merchandise but of services. While some bulk sales risk exists in the excluded businesses, they have in common the fact that unsecured credit is not commonly extended on the faith of a stock of merchandise.

Uniform Commercial Code § 6–102 comment 2 (1979) (emphasis supplied).

**7.** *See e.g., Uarco, Inc. v. Peoples Bank & Trust Co. of St. Bernard,* 414 F.Supp. 1219, 1220 (E.D.La.1976) (dictum); *De La Rosa v. Tropical*

*Sandwiches, Inc.,* 298 So.2d 471, 473 (Fla.Ct. App.1974); *Kentucky Club, Inc. v. Fifth Third Bank,* 590 S.W.2d 686, 687 (Ky.1979); *Buckley's Inc. v. Tell-Mall, Inc.,* 93 Mich.App. 570, 287 N.W.2d 3 (Mich.Ct.App.1979) (per curiam); *Silco Automatic Vending Co. v. Howells,* 102 N.J.Super. 243, 245 A.2d 765, 768–69 (N.J.Super.Ct.Ch.Div.1968), *aff'd, per curiam,* 105 N.J. Super. 511, 253 A.2d 480 (N.J.Super.Ct.App. Div.1969); *Kane-Miller Corp. v. Tip Tree Corp.,* 60 Misc.2d 776, 303 N.Y.S.2d 273 (N.Y.Sup.Ct. 1969); *Nichols v. Acers Co.,* 415 S.W.2d 683, 689 (Tex.Civ.App.1967) (dictum). Lower courts in Pennsylvania have disagreed with this majority rule, *see, e.g., Zinni v. One Township Line Corp.,* 36 Pa.D. & C.2d 297 (1965), but these decisions appear to rest upon pre-Article 6 precedent and fail to take into account the changes wrought by that article. *See* R. Anderson, 3 Anderson on the Uniform Commercial Code § 6–102:5 n. 11, at 447 (2d ed. 1971).

will sell most or all of his inventory in a single transaction and disappear with the proceeds without paying his creditors. At common law an aggrieved creditor had little or no recourse when faced with this kind of event. Once the debtor sold his inventory, the creditor could not reach the goods in the buyer's hands as long as the buyer was a bona fide purchaser. By hypothesis, the creditor had little hope of obtaining satisfaction from the personal assets of the debtor. To remedy this problem, most states enacted bulk sales laws which offered various kinds of protection to creditors. These statutes have gradually been replaced as states have adopted Article 6 of the Uniform Commercial Code, which is intended to give unsecured trade creditors some measure of protection against less-than-honest debtors.

In many states Article 6 is simply a notice requirement. The article entitles creditors to receive advance notice of a bulk transfer, but does not confer upon creditors any specific remedy for collecting their debts.[8] Alaska is among the minority of the states which have adopted a provision that imposes upon a bulk purchaser the obligation not only to notify creditors, but also to pay creditors' claims, to the extent of the purchase price, from the proceeds of the transaction.[9]

In our view, these protections are not applicable in this case because the sale of a restaurant does not present the evils that Article 6 is designed to prevent. As the commentary to Article 6 explains,[10] restaurants were not intended to be covered by the article because restaurants' trade creditors generally do not extend unsecured credit on the faith of the restaurants' stock of merchandise, and thus creditors suffer no appreciable detriment when a restaurant sells all or most of its stock at once rather than in the ordinary course of business.[11]

Matanuska Maid argues that the A & W restaurant in this case falls within Article 6 because a restaurant's creditors do rely upon the restaurant's stock of inventory for repayment of their claims. Matanuska Maid points out that when a trade creditor sells food products on credit to a restaurant, it does so with the expectation that the restaurant will convert those products into meals to be sold to the public, and that the proceeds will then be used to pay the restaurant's debts. Thus, it concludes, creditors are relying on the restaurant's inventory when extending credit.

■ We agree with this observation, but it is not pertinent to the issue of the applicability of Article 6. It is difficult to conceive of any situation in which a trade creditor does not rely on a business's ability

---

**8.** The basic philosophy of Article 6 is that creditors should have advance notice of an impending bulk transfer in order to give them a chance to protect their interests; thus, Article 6 requires a bulk buyer to give notice to creditors of the proposed transfer. A buyer who fails to give notice runs the risk that creditors will be able to disregard the transfer and to levy upon the goods which he has purchased as though those goods remained in the debtor's possession. On the other hand, a buyer who complies with Article 6 may rest secure in the knowledge that any dispute over nonpayment of debts is limited to the original parties, the creditors and the debtor; creditors have no recourse against the bulk buyer.

**9.** AS 45.06.106.

**10.** See note 6 supra.

**11.** We note also that Article 6 generally does not apply to the sale of a business's physical plant or fixtures, the most valuable assets

owned by most service-oriented enterprises such as restaurants; rather, the article applies to sales of "materials, supplies, merchandise or other inventory." AS 45.06.102(a). A sale of equipment triggers Article 6 only if that sale accompanies a sale of inventory. See AS 45.-06.102(b); H.L.C. Imports Corp. v. M & L Siegel, Inc., 98 Misc.2d 179, 413 N.Y.S.2d 605, 606–07 (N.Y.Civ.Ct.1979).

The parties have not addressed the question whether there has been a sale of "materials, supplies, merchandise or other inventory" in this case. The bill of sale for the restaurant covers only the restaurant's equipment and fixtures; although it may be reasonable to assume that the purchasers of the A & W acquired the restaurant's supplies and inventory as well, there is no proof to that effect in the record. Thus, there is some question whether the transaction in this case is of the kind governed by Article 6 even if restaurants are businesses which are subject to that article.

to convert supplies, merchandise, or inventory into goods or services for which the public will pay, and to that extent trade creditors undoubtedly rely upon inventory for repayment of their claims. For purposes of Article 6, however, the pertinent question is not whether trade creditors extend credit with the expectation that a businessperson will successfully convert stock into saleable merchandise, but whether the creditor extends credit with the expectation that he will be able to reach the debtor's inventory or merchandise if the debtor fails to pay. Restaurants and similar service-oriented businesses are excluded from Article 6 because such enterprises' trade creditors tend to extend credit not on the faith of a stock of merchandise which can be seized to satisfy a claim, but upon their perception of the honesty and business acumen of the debtor.

■ In short, we conclude that the evils that Article 6 is designed to prevent are not present in a transaction involving the sale of a restaurant, and therefore that the requirements of Article 6 do not apply in this case.[12]

III. *Is Article 6 Applicable by Estoppel?*

Matanuska Maid's alternative argument is that even if article 6 is inapplicable to the sale of a restaurant, the article is applicable by estoppel because ABM's notice to creditors expressly stated that the sale was being conducted in accordance with "the Alaska Statutes governing Bulk Sales." Matanuska Maid contends that ABM may not now deny that Article 6 governs the transaction and that Matanuska Maid was entitled to payment from the escrow funds held by ABM.

In *Jamison v. Consolidated Utilities, Inc.*, 576 P.2d 97 (Alaska 1978), we explained

that "[t]he general elements required for the application of the doctrine of equitable estoppel are the assertion of a position by conduct or word, reasonable reliance thereon by another party, and resulting prejudice." *Id.* at 102 (footnote omitted). In our view, the record is devoid of evidence that Matanuska Maid relied upon ABM's notice to creditors, or that Matanuska Maid will be prejudiced unjustly should the requirements of Article 6 not be applied in this case. Therefore, we reverse the superior court's ruling that Article 6 is applicable by estoppel.

■ Our conclusion rests in part on a review of the evidence adduced at trial. Matanuska Maid received ABM's notice to creditors on January 29, 1979. The notice instructed creditors to send their bills to ABM and informed creditors that the closing would take place sometime between February 5 and 28. Moses Lacson, Matanuska Maid's controller, testified that upon receiving ABM's notice he instructed an employee in charge of billings to send a statement to ABM as well as to the A & W. He further stated that he was certain that Matanuska Maid had sent a copy of the bill to ABM because the employee charged with that task was an efficient, reliable employee.[13] The only proof offered that Matanuska Maid had sent a bill to ABM was a copy of a statement dated March 31, 1979, which was addressed not to ABM but to the A & W restaurant.[14] The district court found that Matanuska Maid did not send any bill to ABM until late June, after Lacson called ABM to ask when payment would be forthcoming. This finding has not been challenged and in any event is supported by the record.

The uncontradicted testimony of the ABM employee who handled the escrow of

12. In view of our ruling, we need not address ABM's alternative argument that Article 6 is inapplicable because a restaurant is an enterprise which sells services and not an enterprise whose "principal business is the sale of merchandise from stock." AS 45.06.102(c).

13. Lacson had no personal knowledge of whether a bill had been sent to ABM, and the

employee who was asked to send a bill to ABM did not testify at trial.

14. As counsel for ABM pointed out at trial, it is difficult to see how a statement dated March 31 and addressed to the restaurant is proof that Matanuska Maid sent a bill to ABM shortly after receiving ABM's notice to creditors on January 29.

the restaurant, Beth Hafkey, was that ABM received no word from Matanuska Maid until late June, when Lacson called her to inquire when Matanuska Maid would be paid. When asked by the court why he waited five months to look into the status of Matanuska Maid's bill, Lacson replied that he had made no earlier inquiry because the amount involved was not large enough.[15]

In short, the record establishes not that Matanuska Maid relied on ABM's notice and therefore looked solely to ABM for payment of its bill, but rather that Matanuska Maid did nothing in response to ABM's notice because the amount involved was insignificant. Finally, there is no evidence that Matanuska Maid will be prejudiced if Article 6 is not applied by estoppel. Of course, Matanuska Maid will not be able to collect its bill from ABM, but absent Article 6 it had no right to demand payment from the proceeds of the sale to begin with. Thus, Matanuska Maid is in no worse a position than it would have been in had ABM not represented that the sale of the restaurant was being conducted in accordance with Article 6. Its recourse, as before, is against the persons to whom it extended credit. Thus, we conclude that the superior court erred in reversing the district court's judgment and in ruling that ABM was estopped to deny the applicability of Article 6.[16]

REVERSED and REMANDED with instructions to affirm the district court's judgment.

15. The exchange at trial was as follows:

THE COURT: [The January 29 notice to creditors] clearly states that all bills should be sent to ABM Escrow Closing .... It says that closing will be sometime between February 5, 1979 and February 28, 1979. I was just wondering why somebody wouldn't, why you wouldn't, you or Miss Schaefer (ph) or somebody at your firm sort of call and contact these people at least shortly after February 28 when you would think it would be closed, or if not February, March or April or May, why wasn't something done, wouldn't you be concerned about getting your check?

MR. LACSON: Well, for one thing, the amount involved was not that big, it was only, at the time it was only $1,600 and, secondly, we felt that sending the monthly billing to the address ... was enough, sufficient notice ....

16. In light of our ruling, we need not answer the question whether Article 6, which addresses the question of a bulk purchaser's liability, is applicable as well to the purchaser's or the seller's agent.