[No. 7752–7–III.  Division Three.  May 14, 1987.]

RICHARD POYNOR, ET AL, *Respondents,* v. TWIN CITY MOTOR SUPPLY, INC., ET AL, *Defendants,* STANDARD BATTERIES OF SPOKANE, INC., *Appellant.*

Claude F. Bailey and Lukins & Annis, for appellant.

Leland B. Kerr and Evans & Kerr, for respondents.

MUNSON, J.—Standard Batteries of Spokane, Inc., appeals the trial court's distribution of bulk transfer proceeds in an interpleader action. We affirm.

The facts are essentially undisputed. In late 1983, Twin City Motor Supply, Inc., found itself in severe financial difficulty. On March 23, 1984, Twin City and Richard and John Poynor, d/b/a Poynor Brothers Partnership, entered into an agreement whereby Poynor agreed to purchase all of the assets of Twin City for a purchase price of $222,847, plus inventory at current wholesale/jobber costs. The value of the inventory was to be determined by a joint inventory conducted by the parties at the time of closing. Poynor issued a notice to creditors on the same day. The notice did not state whether trade creditors were to be paid the full amount owed them.

Under the terms of the agreement, Poynor agreed to pay a portion of the purchase price by assuming Twin City's deeds of trust held by Rainier Credit and Seattle–First National Bank, which Twin City later represented to be current in the respective amounts of $72,589.34 and $88,238.73. The balance of the purchase price, plus inventory at cost, was to be paid by Poynor in cash. Poynor assumed no other liabilities of Twin City. Transfer of the

personal property was to be by bill of sale "free of any claim or encumbrance." Twin City represented and warranted good and marketable title to all real property subject only to the disclosed encumbrances and that all "inventory, furnishings, fixtures, shop equipment and automobiles are free and clear of any claims, encumbrances or security interests."

The transaction closed on April 6, 1984; Poynor took possession 1 day later. The value of the inventory was subsequently determined to be $115,186.68.

Thereafter, it was learned the warranties made by Twin City were not true. There were a number of delinquent real estate payments to Rainier Credit and Seattle–First National Bank, delinquent LID payments to the City of Kennewick, delinquent real and personal property taxes to Benton County, and undisclosed security interests in the inventory securing a pension trust and Jobber's Warehouse, Inc. Pursuant to Twin City's request, Poynor paid a sum to the closing agent for the purpose of clearing the security interests held by the pension trust and Jobber's Warehouse, Inc. At Twin City's request, the closing agent paid $53,619.93 to the pension trust trustee, Seattle–First National Bank, and $58,512.73 to Jobber's Warehouse, Inc.

These payments rendered Twin City insolvent in that the balance of the sales proceeds were insufficient to pay the claims of unsecured trade creditors, totaling $66,226.25, and the real estate encumbrances. On May 29, Poynor filed a complaint to interplead funds and tendered the remaining sum of $73,558.89 into court. Poynor also filed a petition for partial distribution of the proceeds for payment of encumbrances of the real estate assets acquired in the sale to prevent foreclosures by the secured creditors. The court ordered a partial disbursement of $39,574.03 on May 31. The remaining proceeds totaled $33,984.86.

On June 12, Poynor filed another notice to creditors. This was the first notice the trade creditors received that there were insufficient funds to satisfy their claims in full. The trial court found that the disbursement of $39,574.03

to pay the real estate encumbrances was proper, with minor exceptions.[1] The court determined that Poynor was entitled to pay out of the purchase price (1) amounts owing to all secured creditors, (2) all charges, taxes, and fees necessary to close the sale, and (3) all delinquent payments to secured creditors necessary to bring the transactions current. Standard, an unsecured trade creditor, appeals.

The parties agree this case is governed by Article 6 of the Uniform Commercial Code (RCW 62A.6–101 *et seq.*). Standard contends the trial court erred by authorizing a payment of $39,574.03 to satisfy these real estate encumbrances which were part of the bulk sale. Standard asserts Article 6 requires the bulk sale proceeds to be used to satisfy the claims of the trade creditors before the claims of nontrade creditors. Thus when this situation develops, before paying any amount, a purchaser should either renegotiate the sale or decline to go forward. Therefore, the court erred in authorizing this payment before the trade creditors were paid in full. The trial court disagreed:

> This is a novel and ingenious argument. The Court, however, can find no support either in the case law or in the Bulk Transfers Code to support a separate fund or "honey pot" theory for trade creditors. In capsule, the Bulk sales law sets aside to trade creditors, as a prioritized class, any funds that are left over after payment of the purchase price and after payment of secured creditors holding perfected liens. That is the only "fund" available to trade creditors.

The resolution of this issue depends upon a construction of Article 6, the main purpose of which is to protect unsecured creditors in two situations. In the first situation, a merchant owing debts sells his assets to a friend for less than they are worth. He then pays his creditors less than he owes them and hopes to come back into the business

---

[1]The court found a $610.54 payment to Transamerica Title Insurance Company, a $147.66 payment to Columbia County Title Company, and an $867.20 payment to the closing agent for attorney fees unnecessary to perfect title and thus improper. The court ordered Poynor to pay $1,625.40 into the registry of the court.

through the back door sometime in the future. In the second situation, a merchant owing debts sells the assets of his business to anyone for any price and disappears with the proceeds. *See* Official Comment 2, U.C.C. § 6–101 (1977). *See also Blanchard Co. v. Ward,* 124 Wash. 204, 208, 213 P. 929, 33 A.L.R. 59 (1923).

To protect against either of the occurrences, RCW 62A.6–105 states that a bulk transfer "is ineffective against any creditor of the transferor unless at least ten days before he takes possession of the goods or pays for them, whichever happens first, the transferee gives notice of the transfer in the manner and to the persons hereafter provided".

RCW 62A.6–106(1) imposes a duty on the purchaser

> to assure that such consideration is applied so far as necessary to pay those debts of the transferor which are either shown on the list furnished by the transferor (RCW 62A.6–104) or filed in writing in the place stated in the notice (RCW 62A.6–107) within thirty days after the mailing of such notice.

RCW 62A.6–109(1) defines what creditors are protected under Washington's version of Article 6:

> The creditors of the transferor (or claimants against the transferor) mentioned in this Article are those to whom the transferor is indebted for or on account of services, commodities, goods, wares, or merchandise, or fixtures and equipment, used in or furnished to the business of the transferor, or for or on account of money borrowed to carry on the business of the transferor or for or on account of labor employed in the course of the business of the transferor, of which the goods, wares and merchandise, or fixtures and equipment, bargained for or purchased are a part. Creditors who become such after notice to creditors is given (RCW 62A.6–105 and RCW 62A.6–107) are not entitled to notice.[2]

■ Article 6 is designed to protect unsecured trade

---

[2]Washington is unique in that it limits the protection of Article 6 to "trade" creditors; the Uniform Commercial Code, Article 6 protects all creditors holding claims based on transactions occurring before the bulk transfer. *See* 7 R. Anderson, *Uniform Commercial Code* § 6–109:2 (3d ed. 1985); Annot., 85 A.L.R.2d 1211, 1237 (1962 & Supp. 1986).

creditors who lent credit relying on the assets of the business, *Harbor Air Serv., Inc. v. Board of Tax Appeals,* 88 Wn.2d 359, 364, 560 P.2d 1145 (1977), by requiring the purchaser: (1) to notify these creditors of the impending sale so that they can protect their interests, *see* J. White & R. Summers, *Uniform Commercial Code* § 9, at 757 (2d ed. 1980); and (2) to pay creditor's claims, to the extent of the purchase price, from the proceeds of the sale. *See* 7 R. Anderson, *Uniform Commercial Code* § 6–106:5 (3d ed. 1985); *ABM Escrow Closing & Consulting, Inc. v. Matanuska Maid, Inc.,* 659 P.2d 1170, 1173 (Alaska 1983).

Both parties cite *Huguelet v. M & M Assocs.,* 375 So. 2d 1150 (Fla. Dist. Ct. App. 1979).[3] There, an unsecured trade creditor contended that *all* creditors should receive a pro rata distribution of the total purchase price in a bulk transfer. The court disagreed and held that because secured creditors have preference over unsecured creditors under Article 9 of the Uniform Commercial Code, their claims will be satisfied first and the balance of the purchase price distributed pro rata to the unsecured creditors. *Huguelet,* at 1151. Here, the parties who had security interests in Twin City's inventory, the pension trust and Jobber's Warehouse, Inc., were paid first; these payments are not disputed here.

The Mississippi Supreme Court considered the same issue and found the reasoning of *Huguelet* persuasive. In *William Iselin & Co. v. Delta Auction & Real Estate Co.,* 433 So. 2d 911, 914–15 (Miss. 1983), the court quoted language from 3 R. Anderson, *Uniform Commercial Code* 472 n.14 (2d ed. 1971) in reference to the requirement that all creditors be paid on a pro rata basis:[4] "This necessarily assumes the absence of any valid security interest or other right which would give a creditor a preference or priority

---

[3]Both parties cite *Harbor Air Serv., Inc. v. Board of Tax Appeals, supra,* in support of their positions; however, we find it does not support either and is not applicable to this case.

[4]RCW 62A.6–106(3) provides: "If the consideration payable is not enough to pay all of the said debts in full distribution shall be made pro rata."

over other creditors generally or with reference to particular property."[5] The court then concluded "a secured status cannot be destroyed simply because the debtor's assets were ultimately sold in a bulk transfer auction sale." *William Iselin*, at 915.

Standard's contention that trade creditors have priority over nontrade creditors in bulk sale proceeds is without citation of authority other than the language in RCW 62A.6–109(1), which merely defines what creditors are entitled to advance notice of a bulk sale. It contains no schedule of priority as to the proceeds among creditors. *See In re McBee*, 714 F.2d 1316, 1327 n.18 (5th Cir. 1983); J. White & R. Summers, at 776; *see also* U.C.C. Serv.—Sales and Bulk Transfers (MB) § 15.01, at 15–4 (1984) ("Beyond [giving notice to creditors] very little protection is given and very little protection can be given by statute."). Despite the language in Washington's version of Article 6 limiting protection to "trade" creditors, we do not believe the Legislature intended to give trade creditors priority to all bulk sale proceeds. We agree with the observation that the pro rata distribution to trade creditors is subject to "any valid security interest or other right which would give a creditor a preference or priority over other creditors". R. Anderson, at 415 n.2. The parties which hold security interests in the real estate to be transferred have an "other right" which entitles them to a priority over unsecured trade creditors. *See In re Clement Bulk*, 71 Pa. D. & C.2d 717, 18 U.C.C. Rep. Serv. 1280 (C.P. 1976).

Standard contends that only $1,910.91 was used to pay costs which were legally required to allow the deed to be recorded, while the remaining $37,663.12 was primarily used to pay overdue real estate loan payments and property assessments. Standard asserts that had Poynor gone ahead with the transaction without paying the creditors, the real

---

[5]This language can now be found at 7 R. Anderson, *Uniform Commercial Code* 415 n.2 (3d ed. 1985). *See also Bomanzi of Lexington, Inc. v. Tafel*, 415 S.W.2d 627, 630 (Ky. 1967).

estate purchased would be subject to the claims of the creditors, but that Poynor's interest in receiving unencumbered property would not override the obligation under RCW 62A.6–106(1) to apply the proceeds of the bulk transfer to satisfy the claims of the unsecured trade creditors.

The sales agreement provides that the real estate encumbrances are to be paid out of the purchase price at the date of closing. Standard's contention that the sales agreement cannot override the obligations imposed upon Poynor by Article 6 is not well taken. As explained previously, Article 6 does not elevate unsecured trade creditors to a position of priority over creditors which have security interests in noninventory property. Thus, whether Poynor was "legally" obligated to pay the costs of closing out of the purchase price is irrelevant; it was contractually authorized to do so.

The trial court authorized the payment of all charges, taxes, and fees necessary to close the sale. We agree with the trial court that, were we to disapprove of these payments, we would be, in effect, rewriting the sales agreement. That is, if Poynor was required to satisfy the claims of the unsecured trade creditors without payment of those delinquent real estate claims, the sales price would be increased by $32,241.39.

In conclusion, we agree with the trial court's finding that Article 6 does not set aside the bulk sale proceeds for the unsecured trade creditors. The purpose of Article 6 is to protect unsecured creditors who have lent credit relying on the assets of the business from an inadequate purchase price or from the seller pocketing the proceeds. Neither of these two types of commercial fraud is alleged or occurred in this case. Therefore, the trial court correctly authorized the payment of the real estate encumbrances before the distribution to the unsecured trade creditors under Article 6.

Standard's next two contentions, that Poynor did not comply with the notice requirements of Article 6 or with the time requirement of RCW 62A.6–106(4), will not be

considered as Standard failed to raise these contentions in the trial court. RAP 2.5(a).

The judgment is affirmed; Standard's request for attorney fees is denied.

THOMPSON, A.C.J., and GREEN, J., concur.