**LAND TITLE COMPANY OF ALASKA, INC., an Alaska corporation, Appellant,**

v.

**ANCHORAGE PRINTING INCORPO-RATED, Howard E. Wright, Fusako M. Wright, Commercial Investment Brokers, Inc., an Alaska corporation, and Jerry Wickstrom, Appellees.**

No. S–2655.

Supreme Court of Alaska.

Dec. 8, 1989.

J.L. McCarrey, III and William Grant Stewart, McCarrey & McCarrey, Inc., Anchorage, for appellant.

Russell E. Arnett, Anchorage, for appellee, Anchorage Printing.

OPINION

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

MOORE, Justice.

Land Title Company of Alaska, Inc. ("Land Title") appeals from a judgment of the superior court holding it liable to Anchorage Printing, Inc. ("Anchorage Printing") as a result of Land Title's negligence in the closing of a land sale transaction. For the reasons set forth below, we remand the case with instructions to vacate the judgment against Land Title.

I.

Anchorage Printing initiated this action to set aside an unauthorized purchase of real estate made by the corporation's secretary-treasurer, Michael Rhodes. Anchorage Printing is a closely-held corporation owned by the three sons of Charles Herbert (Herb) Rhodes, who served as president of the corporation. Charles Gregory (Greg) Rhodes served as vice-president and general manager. Michael Rhodes served as secretary-treasurer and acted as shop foreman. Christopher Rhodes acted as pressman. All three sons were also directors, and each held one-third of the corporation's voting stock.

In late 1985, Herb and Greg Rhodes noted that Michael Rhodes was exhibiting bizarre behavior resulting from his impending divorce. On February 2, 1986, Michael was admitted to Alaska Psychiatric Institute after an episode in which he appeared close to suicide. He was released on February 4, 1986, with the recommendation that he receive inpatient psychiatric treatment, but the Rhodes declined this option.

In March 1986, Thomas O'Connor, a real estate agent with Commercial Investment Brokers, Inc. ("Commercial Investment"), learned that Michael Rhodes was interested in property surrounding Anchorage Printing's shop. O'Connor, acting on behalf of

Howard and Fusako Wright, approached Michael concerning the Wright's property. Michael met several times with O'Connor and another agent for Commercial Investment. On March 19, 1986, they entered into an earnest money agreement for the purchase of the Wrights' property. Michael gave the Wrights an Anchorage Printing corporate check for $2,000 as earnest money.

According to the terms of the agreement, the transaction was to close no later than April 1, 1986. Anchorage Printing was to be the purchaser, and Land Title was to act as the closing/escrow agent. Prior to the signing of the closing documents, Land Title's escrow supervisor Phyllis Newcombe contacted O'Connor and asked him who would be signing for Anchorage Printing and if there was a corporate resolution available. O'Connor testified that Newcombe told him that a corporate resolution was necessary and that Newcombe would obtain the resolution. Newcombe testified that she discussed with O'Connor the need for a corporate resolution, but that O'Connor, rather than herself, had agreed to obtain it. The signing of documents took place at the office of Land Title on March 28, 1986. O'Connor attended the signing with the Wrights. The Wrights signed first. Michael Rhodes signed after the Wrights had left. Newcombe testified that when Michael appeared she asked him whether he had a corporate resolution, and he stated that he had none but would obtain one. On April 1, 1986, Newcombe recorded the documents according to the escrow instructions without having received a resolution from Michael Rhodes.

On April 23, 1986, Newcombe spoke with Greg Rhodes, general manager of Anchorage Printing, and asked him for the corporate resolution. Greg responded that he knew nothing of the transaction and that there was no corporate resolution. On May 16, 1986, counsel for Anchorage Printing wrote to Land Title, advising it that Michael had no authority to act for Anchorage Printing in the transaction. The Wrights declined to rescind the sale, and Anchorage Printing brought suit against the Wrights, Commercial Investment, and Land Title.

## II.

A trial was held before Superior Court Judge Milton M. Souter sitting without a jury. The court found that Anchorage Printing was not negligent and that Michael Rhodes was not incompetent. The court concluded that Michael Rhodes did not have express, inherent, implied, or apparent authority to buy the property. The court held that real estate agent O'Connor and broker Vern Padgett had a duty to determine if Michael had authority to purchase the property. The court also held that they were agents for the Wrights and that they were primarily responsible for the problems resulting in the sale.

As to Land Title, the court held that it had no contractual relationship with Anchorage Printing. The court found that Phyllis Newcombe had followed all the contractual obligations in the escrow instructions. However, the court also found that Newcombe had gratuitously sought a corporate resolution and was negligent in proceeding to record the documents without the resolution.

The superior court set aside the sale and pursuant to Civil Rule 82, held Commercial Investment, Land Title, and the Wrights jointly and severally liable for Anchorage Printing's attorney's fees and costs. The same award was made against Jerry Wickstrom, the assignee of Commercial Investment's real estate commission, but his fees were apportioned in accordance with the total percentage of the case in which he was involved. Land Title appeals.

## III.

### A. Land Title's Negligence in Closing the Real Estate Transaction

The trial court found that Land Title, through Phyllis Newcombe, gratuitously undertook to obtain the corporate resolution authorizing the sale. The court concluded that by negligently failing to obtain the resolution and then allowing the transaction to be closed and the documents re-

corded Land Title was liable to Anchorage Printing in tort. The trial court specifically found that had Land Title sought to obtain the resolution before the closing the unauthorized acts of Michael Rhodes likely would have been discovered and the transaction cancelled.

Land Title argues that the court erred in holding it liable in tort to Anchorage Printing for recording the executed documents without a corporate resolution. Judge Souter found that Newcombe "undertook [a duty] to obtain a corporate resolution before proceeding with closing on this transaction." Land Title contests this conclusion, arguing that it did not assume any duty beyond the contractual obligations found in the escrow instructions of the buyer and seller.

Even assuming that we agree with Judge Souter that Land Title could be held liable in tort for economic losses for its failure to perform a gratuitous undertaking made in addition to its contractual duties,[1] we do not find sufficient evidence in the record of such an undertaking by Land Title.[2]

The facts upon which an undertaking was found are as follows. Newcombe called Commercial Investment's agent Tom O'Connor to ask who would be signing for Anchorage Printing. After being told that Michael would sign, she said, "I'm going to

---

**1.** Courts have traditionally not found tort liability to a third person when the wrongdoing of the defendant consists of a nonfeasance and results solely in economic losses.

The refusal to find any liability to third persons has been most definite where (1) the only wrong of the defendant consisted in the failure to perform a promise made as to be distinguished from defective performance, and (2) the loss suffered was economic in character. Such "nonfeasance" ordinarily leads to no tort liability even to the promisee, whose remedy must be on the contract itself; and it follows that a third person—who is not a party to the contract—has no chance of recovery in tort or any theory. Thus, it is quite generally agreed that if the defendant contracts to accept employment with A, in work which will affect the safety of B, and then entirely fails to appear for work and never enters upon the employment, he may be liable to A for breach of contract, but he will have no liability in contract or in tort to B. In fact, there would ordinarily be no liability for economic loss as a consequence of misfeasance or defective performance unless there was some kind of special relationship between the defendant and the third party apart from the contract on the basis of which liability for negligence in tort could be imposed beyond that imposed to the promisee on the basis of a manifested intent.

W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on The Law of Torts* § 93, at 668–69 (5th ed. 1984) (footnotes omitted).

Our recent case law suggests, however, that we have moved away from reliance on these distinctions for withholding tort liability. In *LaMoureaux v. Totem Ocean Trailer Express, Inc.,* 651 P.2d 839, 840 n. 4 (Alaska 1982), we rejected the traditional distinction between liability for nonfeasance as opposed to malfeasance. As this court noted:

Several courts have intimated that there can be no liability in the assumption of a duty of care context where the negligence consists of a mere nonfeasance as opposed to malfeasance, i.e., negligent performance. *See, e.g., Hanson v. Blackwell Motor Co.,* 143 Wash. 547, 255 P. 939 (1927). We think this distinction without merit and decline to adopt it here. As we noted in *Adams v. State,* 555 P.2d 235, 240 n. 10 [ (Alaska 1976),] "[w]here there is a duty to act, inaction as well as unreasonable action may constitute a breach." *See also Transamerica Title Ins. Co. v. Ramsey,* 507 P.2d 492, 496 (Alaska 1973).

651 P.2d at 840 n. 4.

Furthermore, in *Mattingly v. Sheldon Jackson College,* 743 P.2d 356, 360 (Alaska 1987), we stated that "judicial reluctance to allow recovery for purely economic losses [for negligent conduct] is discordant with contemporary tort doctrine." In *Mattingly,* we held:

[A] defendant owes a duty of care to take reasonable measures to avoid the risk of causing economic damages, aside from physical injury [or property damage], to particular plaintiffs or plaintiffs comprising an identifiable class with respect to whom defendant knows or has reason to know are likely to suffer such damages from its conduct. A defendant failing to adhere to this duty of care may be found liable for such economic damages proximately caused by its breach of duty.

*Id.* (brackets in original) (citing *People Express Airlines, Inc. v. Consolidated Rail Corp.,* 495 A.2d 107, 116 (N.J.1985)).

We, however, express no opinion on this question.

**2.** This court will not disturb a lower court's factual finding unless it is clearly erroneous. *Jamison v. Consolidated Util., Inc.,* 576 P.2d 97, 104 (Alaska 1978). "A finding of fact is clearly erroneous when, although there may be evidence to support it, the reviewing court is left with the definite and firm conviction on the entire record that a mistake has been made." *Id.* at 104 n. 14; *see also Parker v. Northern Mixing Co.,* 756 P.2d 881, 887–88 (Alaska 1988).

need a corporate resolution." She was then told by O'Connor that she would have to talk to Michael Rhodes about a resolution. O'Connor testified that he believed it was Newcombe's responsibility to obtain any needed documents for the closing. However, Newcombe testified that she instructed O'Connor to obtain the resolution from Michael. Neither O'Connor nor Newcombe obtained the resolution, but at the closing on March 28, Newcombe asked if anyone had brought the resolution. Michael Rhodes indicated that he had not brought a resolution but that he would obtain one for Newcombe. Michael then signed the closing documents in the presence of O'Connor, who knew the resolution had not been produced. No assurances were given that Newcombe would not record the signed documents until the resolution was obtained. Newcombe recorded the documents on April 1 pursuant to the escrow instructions without having received the resolution promised by Rhodes. On April 23 or 24, Newcombe contacted Anchorage Printing to inquire as to the resolution and discovered that Michael Rhodes had not been authorized to act for the corporation in the transaction.

This evidence fails to establish that Newcombe undertook any duty to obtain the resolution before she closed the transaction by recording the executed documents. Nor do the facts present any reliance by Commercial Investment on Newcombe's obtaining the documents. O'Connor did not object to the signing of the documents by Michael Rhodes when O'Connor knew that Rhodes had not brought the resolution with him. O'Connor testified that he believed at the time of the closing that a resolution was necessary, but he failed to take any action demonstrating this belief. Nor does the evidence show that O'Connor expected Newcombe to obtain the resolution before the recording of the transaction. The fact that Newcombe inquired about the resolu-

tion after the recording of the documents is immaterial.

While O'Connor had a duty as agent of the sellers to verify the authority of Michael Rhodes to purchase the property,[3] we conclude that the evidence presented in the record before us fails to demonstrate that Newcombe promised to assume or actually undertook this duty. We therefore conclude that the superior court's finding of a voluntary undertaking by Land Title is clearly erroneous.

We reverse the judgment of the superior court holding Land Title jointly and severally liable for Anchorage Printing's costs in setting aside the transaction and remand the case for entry of judgment in accordance with this opinion.

REVERSED and REMANDED for further proceeding in accordance with this opinion.

MATTHEWS, Chief Justice, dissenting.

The trial court found that Phyllis Newcombe undertook to obtain the corporate resolution authorizing Mike Rhodes to purchase the property for the corporation. This factual finding is supported by the evidence.

Thomas O'Connor testified that he discussed the need for a corporate resolution with Newcombe and that he told her to obtain the resolution from Rhodes. Newcombe testified that she asked Mike Rhodes for the resolution when the documents were signed and attempted to call Rhodes three times thereafter in order to obtain it. She said that she made these efforts at the behest of O'Connor: "He suggested that I get directly in touch with Mike Rhodes."

Based on this evidence, I am unable to agree with the majority opinion that the trial court's finding that Newcombe undertook to obtain the corporate resolution is

---

**3.** Since O'Connor had a duty to the sellers, it follows that he also had a duty to other parties whose injury by his failure to perform that duty reasonably could be foreseen. The evidence clearly reflects that O'Connor should have realized that his failure to verify Michael Rhodes'

authority would result in harm to Anchorage Printing. By allowing an unauthorized transaction to proceed, Commercial forced Anchorage Printing to undergo the expense of setting aside the transaction.

clearly erroneous—the standard for setting aside findings of fact in judge tried cases. Civil Rule 52(a). Finding no error with respect to the other points raised by appellant, I conclude that this case should be affirmed.