Ralph J. JAMISON, Gerald Willard, B. A. Gilbert, Frank Steger, Thomas Mahan, Alan Tri, Emil Dolchok, J. T. Stover, Gary Steger and Richard Baldwin, Appellants,

v.

CONSOLIDATED UTILITIES, INC., Appellees.

No. 3211.

Supreme Court of Alaska.

March 3, 1978.

Robert M. Goldberg, Anchorage, and Johnston Jeffries, Kenai, for appellants.

Denis R. Lazarus, Anchorage, for appellees.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

## OPINION

RABINOWITZ, Justice.

Appellants, ten former employees of appellee Consolidated Utilities, Ltd., filed a complaint in the superior court seeking past due wages based on an agreement allegedly entered into by their union, the International Brotherhood of Electrical Workers, Local 1547, and Consolidated Utilities. After discovering that the collective bargaining agreement had not been executed, appellants filed an amended complaint seeking retroactive pay based on the unexecuted agreement, the terms of which, they alleged, were "operative and dependent" on only one condition, that Consolidated receive a rate increase from the Alaska Public Utilities Commission. Appellants also sought relief in quantum meruit.[1] Consolidated answered, denying most of the allegations in the complaint and asserting several affirmative defenses. The matter ultimately came before the superior court for a non-jury trial. After the trial was completed, the superior court advised the parties of its decision, stating:

I started with the feeling at the end of the trial that, even if all of the legal issues could be resolved in favor of the plaintiffs, the evidence simply did not allow for recovery by them. After a thorough review of the testimony and the authorities cited, I must so find.

This appeal followed the entry of a formal order in favor of Consolidated Utilities.

The relevant facts are as follows: IBEW Local 1547 and Consolidated Utilities entered into a collective bargaining agreement on July 7, 1970, which by its terms was to continue in effect from April 1, 1970, through March 31, 1971, and "from year to year thereafter unless written notice of termination or request for proposed amendments [was] served by either party not less than sixty (60) days prior to December 31 of any year." The only evidence presented which tended to show that a notification had been sent to Consolidated by the union was a box checked on a form "Request for Strike Sanction" sent by the Local to the International stating that the Local had sent the required notice to the employer. Isaac Waldrop, business manager of the Local, testified that the statements on the form were true. However, after searching the union's files, he could not locate a copy of any written notice sent to Consolidated. The company's bookkeeper, Donald Bailey, testified that he had checked the company's files and could not find a notification. The superior court found that the required notice was not given.

Although the required notification was apparently never given, there were several intraunion meetings discussing a new contract with a wage increase. At this time Consolidated was in very bad financial condition; the employees knew of this condition.[2] At one intraunion meeting held to discuss what the union wanted to negotiate, Gerald Blevins, the power plant manager, told the employees that Consolidated would

---

1. In both their original complaint and amended complaint, appellants sought to recover punitive damages against Consolidated.

2. On April 7, 1971, the referee in bankruptcy confirmed Consolidated's arrangement under Chapter XI of the Bankruptcy Act.

be unable to pay them any more money. Nevertheless, at some point, a collective bargaining agreement was drawn up by the union and presented to the management of Consolidated.[3] The proposed agreement was a three-year contract to run from April 1, 1971, through March 31, 1974. The proposed wage scale for the first year presented approximately a dollar an hour increase for most employees. Roy Marquardt, Consolidated's president, testified that when he met with Waldrop, the business manager of the union, he told Waldrop that a raise was out of the question. He testified:

> I did meet with Ike Waldrop and told him that under the circumstances we absolutely could not give the boys a raise at that time. And I'm sure that at the same meeting I told him that we were hoping to put in an application for a rate increase to the PUC—which was delayed, unfortunately. The referee [in bankruptcy] didn't think this was a suitable charge, so it was delayed. But anyhow, I told Ike that we would ask for an increase to cover an increase for the employees as well as an increase that would hopefully allow us to exist and, in fact, I asked him for any support that he could give us with the PUC when the time came.
>
> There was never any intent on our part—and I'm sure that he understood at the time—to try to ask for a retroactive increase, which in fact I don't think the PUC would have given under any circumstances. . . . And I know . . . I told Mr. Waldrop . . . that an increase, if we got it, would be made effective as of the date we got it.

Consolidated requested a rate increase, in part, based on increased labor costs. Tom Hix, business representative of IBEW Local 1547, testified before the Alaska Public Utilities Commission in March of 1972 with respect to the proposed wage increase.

> MR. LAZARUS [counsel for Consolidated]: [U]nder what contract or pay figures . . . is CUL and the union working now?
>
> MR. HIX: Right now they're drawing pay at the rate on the contract that expired in April of 1971.
>
> MR. LAZARUS: All right, and have you entered into negotiations with [Consolidated] insofar as the new rates are concerned?
>
> MR. HIX: Yes, . . . it began in April of '71 and I believe it was either June or . . . the latter part of July, I believe it was, of '71 that we had arrived at a new contract with new rates and stuff subject to the approval of the bargaining union employees, of course.
>
> MR. LAZARUS: And has this agreement been tentatively approved?
>
> MR. HIX: Tentatively approved and as I say subject to the approval of the bargaining union employees[.]

In June of 1972, the Commission denied Consolidated's request for a flat rate of 22 mills per kilowatt hour, but granted a rate of 18 mills. The Commission specifically did not consider the proposed labor increases in granting the increase. The Commission found:

> CUL estimates that its labor will increase by $26,100 in the test year (fiscal 1972 over fiscal 1971). However, as of the date of the hearing no wage increase had been granted, and Exhibit 4 between CUL and the union representing its employees was only a proposed contract containing tentative labor rates. It is commonly accepted in the utility regulatory field that when wage increases have not been implemented, they will not be recognized for the purpose of determining a utility's revenue requirement in a rate proceeding. Furthermore, the tentative wage increases appear to be clearly in excess of the policies set by the United States Price Commission. The Commission also notes that CUL's labor charges for the year ended June 30, 1970, were

---

3. Tom Walker, Treasurer and Assistant Secretary of Consolidated, testified he requested the proposed contract so Consolidated could go before the Alaska Public Utilities Commission and show its costs projections.

only $59,869 compared to the $84,300 figure for the year ended June 30, 1971. The increase in that year was $24,431, an increase of approximately forty percent. A further proposed increase in the test year of almost thirty percent in labor costs can only be indicative of poor management procedures and inefficient use of help. Such increases cannot be considered reasonable by this Commission.

Approximately one month after the rate increase was given to Consolidated, the company's permit and operating contract were sold to Homer Electric Association.

The testimony at trial differed greatly on the issue of what representations had been made to the employees. Frank Steger, one of the employees, testified that Max Von Radics, a shareholder and director of Consolidated who had significant contact with the employees, told him in June 1971 that the employees had to work to keep the plant going so they could be paid their back pay. Ralph Jamison, another employee, testified that Von Radics told him substantially the same thing. Gerald Willard testified that Von Radics said they would get their back pay if they stayed with the plant. Emil Dolchok testified that Von Radics said they "would get [their] pay if [they] stayed and worked." J. T. Stover testified about a similar representation made by Von Radics to him. Von Radics testified that he had never made any statements about retroactive pay. However, he did testify that had they received a rate increase the men would be paid more.

Other employees testified about a Christmas party in 1971. Benjamin Gilbert testified that Gerald Blevins, plant manager, told them at the party that they could expect the retroactive pay and full union-scale wages, but they had to work for it. Thomas Mahan did not testify about retroactive benefits, but remembered Blevins saying that the workers had to "get on the ball" to get the increases in the contract. Blevins testified that he did not recall any statements about wages at the Christmas party, but if anything had been said, it would have been that if Consolidated received a rate increase, they would be in a position to negotiate with the union.

There were other representations about which the employees testified. Emil Dolchok testified that Blevins said when Consolidated was given a rate increase, the employees would be given retroactive pay. Benjamin Gilbert testified that during the period that the Commission was considering Consolidated's application, Blevins was very happy because it looked as though Consolidated would be granted an increase. Gilbert said that Blevins told him that the increase would enable the company to pay the retroactive benefits and also bring the employees wage up to union scale. He further testified that Blevins made some calculations of how much the retroactive benefits would cost the company. Gerald Willard testified that Blevins often assured him that when the company received their rate increase, it would pay the employees retroactive benefits. Willard also testified that Blevins had said that Consolidated had made a mistake in having Tom Hix testify before the Commission, because they would now have to pay retroactive benefits.

Blevins denied making any of these representations. He said that Marquardt told the employees that the increased wages would be paid if the Commission granted a rate increase. He said he had told the employees that if the increase was granted, the company would be prepared to negotiate with the union.

The only testimony adduced at trial which indicated representations by a person with actual authority to bind the company was given by Isaac Waldrop, the union business manager. He testified concerning a meeting in June or July of 1970[4] between Von Radics, another company representative—presumably Marquardt—Tom Hix and himself. The company asked for assistance in obtaining the rate increase and finding a buyer for the business. Waldrop also indicated the company was concerned that Kenai would terminate their contract

---

4. The witness meant 1971.

if the employees did not stay. Waldrop went on to state:

And aside from this, they . . . wanted to make some guarantees that if they got the increases—or when they got them, that they would pay the men and it would be retroactive to April 1st.

Waldrop was impeached with the fact that he had not mentioned the discussion about retroactive benefits when his deposition was taken. Von Radics denied that there was anything said in this meeting about retroactive pay. Marquardt also denied that there was a discussion of retroactive benefits. Marquardt testified that the company "would increase the pay rate to the employees effective at the same time as [it] got a rate increase from the PUC, if [it] did in fact get it."

In the face of this conflict testimony, the superior court made the following pertinent findings of fact:

4. There was no evidence presented that either party gave the required written notice requesting a new contract and further the evidence presented that the required written notice was not given.

. . . . .

6. There was insufficient evidence to show that the proposed tentative agreement for 1971–1974 was even executed orally, in writing, or by conduct of the parties.

. . . . .

9. Mr. Tom Hix testified at the APUC hearing on behalf of the defendant with respect to prospective increased costs based on increased wages pursuant to the tentative wage proposal but that said agreement was only tentative.

10. The APUC refused to recognize increased costs due to higher wages.

11. The rate increase from the APUC which was granted was only partial and did not reflect additional costs based on increased wages.

12. There was no evidence that the employees would receive higher wages if the APUC rate increase did not reflect increased costs for higher wages. The evidence presented was that any increase in wages was contingent upon a finding by the APUC to increase rates sufficient to cover any increase in wages.[5]

In this appeal appellants argue that the superior court erred in not holding that Consolidated Utilities was estopped from denying retroactive benefits according to a contract which it asserted was valid before Public Utilities Commission. Appellants further contend that the superior court committed error in not finding that Consolidated Utilities' officials ratified by word and deed the union's proposal to pay retroactive benefits.

 We will first address the estoppel specification of error. Here, appellants argue that Consolidated Utilities should not be allowed to deny its contractual liability for promised retroactive benefits, since it asserted the validity of the agreement before the Alaska Public Utilities Commission in hearings on its application for a rate increase.[6] There is a species of estoppel,

---

5. In its conclusions of law, the superior court held as follows:

1. Since the one year contract provided for written notice which was never given and further provided that it would continue in effect should no new contract be executed, no new contract was executed, and the existing contract remained in force during the period in question.

2. Since there was insufficient evidence to show that the proposed tentative agreement was ever executed either orally, in writing, or by the conduct of the parties, the original one year contract remained in force.

3. Since the evidence showed that the defendant had fully complied with the terms of the one year contract, there was no breach of contract and plaintiffs' claim was barred by reason of full payment.

. . . . .

9. Since the plaintiffs alleged that a new contract was in force, the burden of producing evidence of such contract was on the plaintiffs and plaintiffs failed to meet their burden of proof.

6. Appellants rely principally on two cases: *KTVB, Inc. v. Boise City*, 94 Idaho 279, 486 P.2d 992 (1971), and *Lewis v. Atlas Corp.*, 158 F.2d 599, 602 (3d Cir. 1946).

*KTVB* involved a controversy over a cable television franchise in Boise, Idaho. KTVB and another company formed a joint venture in an

sometimes referred to as quasi-estoppel, which precludes a party from taking a position inconsistent with one he has previously taken where circumstances render assertion of the second position unconscionable.[7] The general elements required for the application of the doctrine of equitable estoppel are the assertion of a position by conduct or word, reasonable reliance thereon by another party, and resulting prejudice.[8] *See Arctic Contractors Inc. v. State*, 564 P.2d 30, 40 (Alaska 1977). The Supreme Court of Arizona has noted how quasi-estoppel differs:

> Quasi-estoppel differs from other forms of estoppel in that it appeals to the conscience of the court to prevent injustice by precluding a party from asserting a right inconsistent with a position previously taken by him, and does not require ignorance or reliance as essential elements. It is necessary, however, that any representation made to the party claiming quasi-estoppel must have been based with full knowledge of the facts.[9] (Citations omitted)

The Supreme Court of Kansas has underlined the importance of significant inconsistency.

> 'Quasi-estoppel' . . . must be based on the previous assertion of a position so inconsistent with the one now taken as to make the present claim unconscionable.[10]

The essence of the doctrine of quasi-estoppel is the existence of facts and circumstances making the assertion of an inconsistent position unconscionable. This determination is essentially a factual one and, as such, is one which will not be disturbed on appeal unless the findings on which it is based are clearly erroneous. Civil Rule 52(a). Among the many considerations which may indicate that an inconsistent position is unconscionable and the doctrine of quasi-estoppel should be applied are whether the party asserting the inconsistent position has gained an advantage or produced some disadvantage through the first position; the magnitude of the inconsistency; whether changed circumstances tend to justify the inconsistency; whether the incon-

---

attempt to obtain the franchise. Boise and 13 other cities in the area appointed a committee to draft the specifications for bids. After consideration of the bids, a proposal was chosen which was not the joint venture's. The Boise City Council voted in favor of the committee's choice after conducting a public hearing on the matter. After the contract had been executed, KTVB asserted that the franchise award was illegal and invalid because of procedural defects in the committee and adoption processes. The Idaho Supreme Court held that KTVB was estopped from challenging the franchise award by the doctrine of quasi-estoppel. The court noted that according to the doctrine of quasi-estoppel its attention must be focused upon the specific facts and circumstances of the case before it, but stated generally:

> The requirements for proper application of quasi-estoppel are . . . that the person against whom it is sought to be applied has previously taken an inconsistent position, with knowledge of the facts and his rights, to the detriment of the person seeking application of the doctrine.

*KTVB, Inc. v. Boise City*, 486 P.2d 992, 995 (Idaho 1971).

*Lewis v. Atlas Corp.*, 158 F.2d 599 (3d Cir. 1946), was a diversity case involving a suit for breach of contract concerning the sale of corporate debentures. The validity of an amendment dated August 9 was central to the case. The party asserting the invalidity of the August 9 amendment had taken an inconsistent posi-

tion before the Securities and Exchange Commission. The Third Circuit held:

> If the execution of this amendment was a conditional matter between the parties that condition seems surely to have been met in both the filing of the instrument with the Commission and the acceptance of its terms by plaintiff's counsel at the Commission hearing. Plaintiff can hardly be in a position of asserting the existence of an agreement before a public regulatory body and denying it before a court.

*Lewis v. Atlas Corp.*, 158 F.2d 599, 602 (3d Cir. 1946).

7. *See, e. g., Donaldson v. Le Nore*, 112 Ariz. 199, 540 P.2d 671, 674 (1975); *Godoy v. County of Hawaii*, 354 P.2d 78, 82–83 (Hawaii 1960); *Fast v. Fast*, 209 Kan. 24, 496 P.2d 171, 174 (1972). *See generally United States v. Georgia-Pacific Co.*, 421 F.2d 92 (9th Cir. 1970); *Pacific Nat'l Bank v. Richmond*, 12 Wash.App. 592, 530 P.2d 718 (1975).

8. *See Westenberger v. State Dep't of Educ.*, 333 So.2d 264 (La.App.1976).

9. *Donaldson v. Le Nore*, 112 Ariz. 199, 540 P.2d 671 (1975).

10. *Fast v. Fast*, 209 Kan. 24, 496 P.2d 171, 175 (1972).

sistency was relied on by the party claiming estoppel to his detriment; and whether the first assertion was made with full knowledge of the facts. Thus, in determining whether the doctrine of quasi-estoppel is applicable to the matter before it, the trial court should consider whether the party asserting the inconsistent position has gained an advantage or produced some disadvantage through the first position; whether the inconsistency was of such significance as to make the present assertion unconscionable; and whether the first assertion was based on full knowledge of the facts.

■ In the case at bar, appellants contend that Consolidated Utilities asserted the validity of the proposed contract before the Public Utilities Commission. They point specifically to Consolidated's calling Tom Hix as a witness and to this testimony by Mr. Hix:

> MR. LAZARUS: . . . [W]hat does the tentative contract purport to do to [the wages]?
>
> MR. HIX: Well, as I've said overall a buck ($1.00) an hour increase. . . .
>
> MR. LAZARUS: And this is for the year 1971, is that correct?
>
> MR. HIX: Well, actually the tentative agreement runs from '71 . . . until '74. It's a three year contract.
>
> MR. LAZARUS: And [are] there any other increases?
>
> MR. HIX: Oh, yes.
>
> . . . . .
>
> MR. LAZARUS: Are these increases retroactive?
>
> MR. HIX: Yes, sir.
>
> MR. LAZARUS: (inaudible) of this agreement that the wages would revert back up to the time of the old contract?
>
> MR. HIX: Yes, that is correct.

As noted previously, Hix testified that the contract had been tentatively approved subject to the approval of the bargaining unit. Hix's testimony, presented by Consolidated before the Public Utilities Commission, and the interpretation of the tentative contract

accepted by the trial court are inconsistent to the extent that no mention was made to the Public Utilities Commission that the contract was conditioned on a Public Utilities Commission approved rate increase sufficient to cover the wage increase of the contract. However, appellant's representatives were as aware of this omission as Consolidated; it follows that they could not reasonably have relied on it and were not prejudiced by it. Further, Consolidated gained no advantage from the omission because, although Consolidated was granted a rate increase, the Commission specifically stated it would not consider the wage increases reflected in the tentative contract. The foregoing factors, when considered in conjunction with the superior court's findings of fact that the rate increase "did not reflect additional costs based on increased wages" and that "[t]here was no evidence that the employees would receive higher wages if the Alaska Public Utilities Commission rate increase did not reflect increased costs for higher wages" has lead us to the conclusion that the trial court's finding that the testimony of Hix before the Public Utilities Commission did not preclude Consolidated from asserting the position it took at trial concerning the tentative contract was not error.

■ In their second specification of error, appellants argue Consolidated Utilities repeatedly acknowledged, adopted, affirmed and ratified the union's proposed agreement. They point to the evidence at the rate hearing previously discussed, as evidence tending to show that the union agreed not to strike, and to management's "repeated assertions of the utility's obligations under the back pay provisions of the new contract, but for which the men would have walked out." Appellants rely on several cases which involved employers attempts not to pay monies to the United Mine Workers Welfare and Retirement Fund because they were allegedly forced to sign the respective collective bargaining agreements through duress.[11] In these

11. *Boyle v. North Atlantic Coal Corp.*, 331 F.Supp. 1107 (W.D.Pa.1971); *Lewis v. Gilchrist*, 198 F.Supp. 239 (N.D.Ala.1961); *Lewis v. Kerns*, 175 F.Supp. 115 (S.D.Ind.1959); *Lewis v. Cable*, 107 F.Supp. 196 (W.D.Pa.1952).

cases the courts uniformly hold that even if there was duress in the signing of the agreement, the employers ratified the agreements by paying the benefits. In the words of one court:

> [The employer] cannot by his acts and declarations pretend to be bound by the Agreement so as to prevent strikes and repercussions and then, when full liability under said Agreement is asserted, seek to disaffirm it.[12]

These cases are distinguishable from the case at bar in that here the superior court held that Consolidated Utilities had not entered into a new agreement.[13] The superior court's pertinent findings of fact are not clearly erroneous.[14]

█ Based upon the foregoing and our review of the entire record in the case at bar, we conclude that the arguments advanced in appellants' second specification of error do not warrant reversal or modification of the superior court's findings of fact and conclusions of law.[15]

Affirmed.

---

**12.** *Lewis v. Cable,* 107 F.Supp. 196, 197–98 (W.D.Pa.1952). *See also Sabella v. Litchfield,* 274 Cal.App.2d 195, 78 Cal.Rptr. 845, 847 (1969).

**13.** This fact also distinguishes *Rabouin v. NLRB,* 195 F.2d 906 (2d Cir. 1952), and *Roadway Express, Inc. v. General Teamsters Local 249,* 330 F.2d 859 (3d Cir. 1964), cases also relied upon by appellants.

**14.** A finding of fact is "clearly erroneous" when, although there may be evidence to support it, the reviewing court is left with the definite and firm conviction on the entire record that a mistake has been made. *E. g., Chugach Elec. Ass'n v. Northern Corp.,* 562 P.2d

1053, 1060 n. 22, *rehearing denied,* 563 P.2d 883 (Alaska 1977); *State v. Abbott,* 498 P.2d 712, 727 (Alaska 1972); *Alaska Foods, Inc. v. American Mfr's Mut. Ins. Co.,* 482 P.2d 842, 848 (Alaska 1971).

**15.** Our disposition makes it unnecessary to address several additional points raised by Consolidated in its brief. Before this court, Consolidated contends (1) an action in implied contract will not lie where there is a valid express contract; (2) to be enforceable, a collective bargaining agreement ought to be the written product of bilateral negotiations; (3) the wage freeze of the Economic Stabilization Acts of 1970 and 1971 would have precluded any wage increase; (4) the grievance and waiver provisions of the contract were not used.