NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

SILVER BOW CONSTRUCTION, )
                                  )     Supreme Court No. S-15850
            Appellant,      )
                                    )     Superior Court No. 1JU-13-00792 CI
      v.                      )
                                    )     <u>MEMORANDUM OPINION</u>
STATE OF ALASKA,           )       <u>AND JUDGMENT</u>*
DEPARTMENT OF             )
ADMINISTRATION, DIVISION   )     No. 1581 – April 27, 2016
OF GENERAL SERVICES,     )
                                    )
            Appellee.       )
                                  )

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Louis J. Menendez, Judge.

Appearances: Jack B. McGee, Law Office of Jack B. McGee, Juneau, for Appellant. Sean Lynch, Assistant Attorney General, and Craig W. Richards, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger, Justices.

The State of Alaska, Department of Administration, Division of General Services contracted with Silver Bow Construction to install an air distribution system in the Court Plaza Building in Juneau. During the period of performance, the parties discovered that the contract contained contradictory terms regarding the scope of the

---

\*     Entered under Alaska Appellate Rule 214.

project. Specifically, the State believed that Silver Bow was required under the contract to perform a process referred to as "air balancing"; Silver Bow disagreed and demanded additional compensation to conduct air balancing.

Silver Bow filed a claim with the state procurement officer on the contract under AS 36.30.620.[1] The procurement officer determined that Silver Bow was required to conduct air balancing under the contract. On appeal, the Department of Transportation and Public Facilities reached the same conclusion. The agency found that the provisions of the contract relating to air balancing were in "direct conflict" but that the conflict could be resolved through the application of the contract's order of precedence provision. It concluded that the "unambiguous" terms in the order of precedence provision required Silver Bow to perform air balancing. Finally, it rejected Silver Bow's contention that the existence of a contradiction estopped the State from enforcing one of the contradictory provisions.

Silver Bow appealed the administrative decision to the superior court. The superior court affirmed the Department's decision, similarly reasoning that the contract's order of precedence resolved the contradiction and rejecting Silver Bow's arguments related to estoppel.

Silver Bow now appeals to this court. We AFFIRM the superior court's decision upholding the agency's decision and adopt both of these decisions, attaching them as appendices.

---

[1]     AS 36.30.620 governs claims concerning state procurement contracts. When a dispute arises on such a contract, the statute requires that the contractor file a claim with the procurement officer. AS 36.30.620(a). If the claim "cannot be resolved by agreement, the procurement officer shall, after receiving a written request by the contractor for a decision, issue a written decision." AS 36.30.620(b). AS 36.30.625 then provides for appeal to the "commissioner of administration" or the "commissioner of transportation and public facilities," depending on the type of contract.

BEFORE THE STATE OF ALASKA OFFICE OF ADMINISTRATIVE HEARINGS
ON REFERRAL BY THE COMMISSIONER OF ADMINISTRATION[*] [1]

| | | |
|---|---|---|
| SILVER BOW CONSTRUCTION | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DIVISION OF GENERAL SERVICES | ) | OAH No. 12-0025-CON |
| | ) | Contract No. 2010-0222-9525 |

**REVISED DECISION[2]**

## I.     Introduction

Silver Bow Construction, Inc., [Silver Bow] was awarded a contract by the Division of General Services [Division] for the replacement of a rooftop air handler and associated canopy.  After the air handler was installed, the Division asserted that Silver Bow was also required to provide air balancing services on each of the eight floors of the building served by the air handler.  The contract's technical specifications state that air balancing is not included in the contract, but another provision of the contract is to the contrary.

---

\*        This decision has been edited to remove internal record citations.

[1]        This matter was appealed to the Department of Administration, pursuant to the instruction provided on the contracting officer's letter denying the contract claim. The commissioner referred the matter to the Office of Administrative Hearings. The Commissioner of Transportation and Public Facilities subsequently delegated responsibility for the matter to the Commissioner of Administration, retaining authority to issue the final decision.

[2]        This case was remanded to the administrative law judge for preparation of a revised decision consistent with a proposal for action filed by the Division of General Services.  This revised decision constitutes the final decision in the case.

Silver Bow filed a contract claim asserting that the air balancing work was not within the scope of the original contract, and that it should be provided additional compensation for that work. The contracting officer denied the claim. Silver Bow appeals. The matter was submitted for decision on the written record. The Division argues that under the contract's terms, the technical specification does not control; Silver Bow argues it does. Under the contract's order of precedence term, the technical specification does not control. Silver Bow's claim is therefore denied.

## II.     Facts

On July 6, 2010, the Division of General Services issued Invitation To Bid No. 2010-022-9525 (ITB), requesting bids to remove and replace a roof-mounted air handler at the Court Plaza Building in Juneau, with related electrical, mechanical, sprinkler and roof membrane installation and repair. The ITB's project description in two different locations stated, "After the new air handler unit is installed, the contractor shall conduct air balancing of the air flows on each of the eight floors within the building."

The ITB Table of Contents, sub headed "Division 0 - Bidding and Contract Requirements,"[3] lists various sections, each (other than drawings) identified by a five-digit number, with a title, the form number (if applicable), and the number of pages. The listed sections contain procurement-related documents[4] and contract documents,

---

[3]     According to the Division, Division 0 was part of the 1995 MasterFormat indexing system. However, according to Silver Bow, Division 0 did not come into existence until the 2004 revision to the MasterFormat system, in which the number of divisions was increased to 50.

[4]     The procurement-related documents are Sections 00020-00670, consisting of various forms (25D 3-4, 1-9, 1 OA, 12-14, 16). These forms appear to be the standard "Contract Forms for Construction Bids", as issued by the Department of Transportation

(continued...)

including General Conditions, Supplementary Conditions, certain labor-related provisions, a summary and extensive technical specifications, and drawings, with an appendix showing the various variable air volume (VAV) box locations and air flow (CFM) requirements.

Section 01100 (Summary of Work) precedes the technical specifications and provides that the Work (services and labor "as required by the Contract Documents") includes removal and replacement of a roof-mounted air handler at the Court Plaza Building in Juneau, with related electrical, mechanical, sprinkler and roof membrane installation and repair and "other work as required for an operational air handler and warranted roof" and does not mention air balancing on all eight floors. On the next page, however, the Work is stated to include two phases: Phase One consisting of the removal and replacement of the roof-mounted air handler and associated work, and Phase Two consisting of "air balancing of the air flows on each of the eight floors within the building[,]" referencing the appendix showing the VAV box locations and information. By contrast, Section 15950 of the technical specifications covers "[t]esting, adjusting and balancing of air systems; Roof Top unit and penthouse main branch ducts only" and states "[b]alancing of individual floor ventilation rates including grilles and diffusers is not included in the Work."[5]

Preparation of the contract specifications was the responsibility of an architectural firm, Jensen, Yorba and Lott (architect), under a pre-existing contract with the Division.

---

[4](...continued)
and Public Facilities Forms, which are available online at http://www.dot.state.ak.us/stwddes/dcspubs/forms.shtml#.

[5]     The appended drawings of the VAV box locations include sheet notes stating, "all bathroom exhaust fans to be balanced to 100 cfm." Those drawings, however, were prepared by a different firm, Modem Mechanical, in connection with a prior project in 2001.

Murray and Associates, a mechanical engineering firm (mechanical engineer), was subcontracted by the architect to provide specifications and drawings for the portions of the work within the scope of that profession. As envisioned by the architect and the mechanical engineer, the project involved only replacement of the roof unit, and the mechanical engineer had drafted Section 15950 accordingly. When the Division reviewed the contract documents presented to it by the architect, a Division employee pointed out that it would "be necessary to conduct air balancing on each of the 8 floors after the air handler is installed and operational." Dan Aicher, the contracting officer for the project, drafted language to be included in Section 01100 to cover that work, "as a second phase to this project." The language in Section 15950, however, was not changed. Jeremy Adam, Silver Bow's project manager on this contract, prepared Silver Bow's proposal. In preparing the proposal he relied on the language in Section 15950, which he "considered . . . to be controlling over any other contradicting language" in the ITB.

## III. Discussion

### A. The Order Of Precedence Gives Priority to Section 01100

It is apparent that Section 01100 and Section 15950 are in direct conflict: the former (in one location, while silent in another) states that the contractor is to provide air balancing on all floors; the latter states that work is not included. At issue in this case is whether the conflict may be resolved by resort to the contract's order of precedence provision. That provision states:

> When conflicts[,] errors, or discrepancies within the Contract Documents exist, the order of precedence from most governing to least governing will be as follows:
> • Contents of Addenda
> • Supplementary Conditions
> • General Conditions
> • General Requirements

• Technical Specifications
• Drawings . . . [*etc.*]

The Division argues that Section 01100, which includes the requirement to perform air balancing on all floors, contains the General Requirements, and that it therefore takes precedence over Section 15950, which both parties agree is part of the Technical Specifications. Silver Bow asserts that Section 01100 does not contain the General Requirements.

Resolution of the parties' difference on this point turns on the definition of General Requirements:

> Sections of Division 1 of the Specifications that contain administrative and procedural requirements as well as requirements for temporary facilities applying to Specification Divisions 2 through 16.

The reference to Divisions 1-16 in this definition reflects the terminology used in a standardized construction contract format, the MasterFormat system, maintained by the Construction Specification Institute and utilized by both the Department of Administration and the Department of Transportation and Public Facilities, and expressly identified in Section 01100 as the organizational format for the Specifications. In the standard MasterFormat system, the General Requirements are indexed as Division 1 or 01.

In this particular case, nothing in the ITB expressly identifies Division 1 (or 01), and nothing expressly identifies Section 01100 as part of Division 1 or states that sections beginning 01 constitute Division 1. Moreover, Section 01100 is titled "Summary," rather than "General Requirements." In the absence of an index or table of contents identifying specific divisions and showing which sections belong to each, or a title specifically identifying Section 01100 as the General Requirements, Silver Bow argues it "strains credulity" to read the Section 01100 as stating the contract's General Requirements.

In fact, rather than straining credulity, it is entirely reasonable to read Section 01100 as stating the contract's General Requirements. First, and critically, under the express terms of Section 00700, the General Requirements are defined and identified not by their title, as Silver Bow would have it, but by their functional role. Second, Section 01100 clearly and expressly states that the specifications "are organized into Divisions and Sections using the 16-division format and CSI/CSC's 'MasterFormat' numbering system[.]"[6] Third, it is apparent from a review of the MasterFormat division headings and the text of the other sections in the ITB that the initial two digits of each section correspond to the sixteen different divisions.[7] These considerations make it reasonable to infer that the first two digits of each section number identify a MasterFormat division number, and that Section 01100 contains the contract's General Requirements, as defined in Section 00700.

Rather than treating Section 01100 as part of Division 1, and as containing the contract's General Requirements, Silver Bow would read the contract as having no Division 1 and no General Requirements, and, because the ITB table of contents lists

---

[6]     Specifications are defined as "those portions of the Contract Documents consisting of written technical descriptions of materials, equipment, construction systems, standards and workmanship as applied to the Work and certain administrative and procedural details applicable thereto."

[7]     For example, Section 01732 (Selective Demolition) includes information regarding temporary facilities. *Id*., ¶3 .3(B). Information about temporary facilities is specifically identified as part of the General Requirements, and as such, part of Division I. *See* Section 00700. Sections 07542 (Polyvinyl-Chloride (PVC) Roofing and 07620 (Sheet Metal Flashing and Trim) are within the scope of Division 7 (Thermal and Moisture Protection); Section 09911 (Exterior Painting) is within the scope of Division 9 (Finishes); and Section 13925 (Fire Suppression Sprinklers) is within the scope of Division 13 (Special Construction). The remaining sections, all with the prefix 15, consist of the bulk of the work, and describe matters within the scope of Division 15 (Mechanical).

sections, rather than divisions,[8] as not following the MasterFormat structure at all. This reading is unreasonable, for several reasons. First, it would effectively write out of the contract the language in Section 01100 expressly adopting the MasterFormat numbering system, and the contract should be read to give effect to all its provisions if that is reasonably possible.[9] Second, Section 01100 "contain[s] administrative and procedural requirements . . . applying to [the technical specifications]," which is just what General Requirements are supposed to do. Third, Silver Bow's interpretation disregards the patent symmetry between the section numbers and the MasterFormat division structure.[10]

B.    The Order of Precedence Term Need Not Be Construed Against the Division

Silver Bow argues that, to the extent the contract is ambiguous with respect whether Section 01100 states the General Requirements, it should be construed against the Division, because the Division drafted the contract and it is a contract of adhesion.[11] This rule comes into play only if, after examining the language of the contract and any

---

[8]    As noted in Section 01100, the table of contents provides numbers and names of sections. The table of contents includes only one reference to a division: it bears the heading Division 0, which (according to the Division) is CSI's designation for Introductory Information, Bidding Requirements, and Contract Requirements. Silver Bow's submission does not include a Division 0.

[9]    *See, e.g*, *Wolf v. Cunningham*, 187 P.3d 479, 482 (Alaska 2008).

[10]    *See* note [7], *supra*.

[11]    It has been said that the rule that a contract is interpreted against the drafter applies only to contracts of adhesion. *See, e.g.*, *Little Susitna Construction Company v. Soil Processing, Inc.*, 944 P.2d 20, 25 n.7 (Alaska 1997). A contract of adhesion has been defined as one presented as a take-it-or-leave-it contract, in which the drafting party has substantially greater bargaining power. *See, e.g.*, *Stordahl v. Government Employees Insurance Company*, 564 P.2d 63, 66 note 4 (Alaska 1977). The Division denies that the contract at issue in this case as a contract of adhesion. Proposal For Action at 2, note 2, *citing* Bruner & O'Connor on Construction Law § 3.55.

relevant extrinsic evidence, the terms are reasonably susceptible of differing interpretations.[12] As discussed above, however, the Division's interpretation is reasonable and Silver Bow's is not. Because the contract is not reasonably susceptible of Silver Bow's interpretation, the rule that contracts of adhesion are interpreted against the drafter does not apply. Similarly inapplicable, for the same reason, is the rule cited by Silver Bow to the effect that ambiguities are resolved against the government.[13]

### C. The Order Of Precedence Does Not Give Section 15950 Priority

Even if one were to accept Silver Bow's argument that Section 01100 should not be construed to state the contract's General Requirements, that would not end the analysis. Silver Bow argues that if the contract does not contain any General Requirements, then under the order of preference provision Section 15950 controls. That is a misinterpretation of the order of precedence provision. Under the order of precedence provision, technical specifications expressly control over drawings. Technical specifications, such as Section 15950, are not expressly afforded controlling significance over work requirements, such as those set forth in Section 01100.[14] The

---

[12]     *See C.P. ex rel. M.L. v. Allstate Insurance Company*, 996 P.2d 1216, 1222 note 38 (Alaska 2000).

[13]     *See* Silver Bow Brief at 14-15, *citing Blount Brothers Construction Co. v. United States*, 346 P.2d 962, 972-973 (Ct. Claims 1965). *See also Duncan v. City of Fairbanks*, 567 P.2d 311, 313-314 and at note 10 (Alaska 1974) ("[W]here the local government agency has selected the language of the contract clause in dispute, any doubt or ambiguity will be resolved in favor of the private party. IA C. Antieu, Municipal Corporation Law §1056 at 801 (1974.")).

[14]     It is does not appear that the order of precedence provision makes technical specifications controlling over the items listed beyond drawings. It appears that the additional items list specific items that control another within the same category (e.g., conflicting technical specifications or drawings), rather than a continuing order of

(continued...)

order of precedence provision provides that the technical specifications control drawings, such as the VAV drawings in Appendix A, but it does not provide for the precedence of technical specifications over work requirements or a Summary, such as is contained in Section 01100. The order of precedence simply does not apply to items that it does not mention. Thus, to accept Silver Bow's argument that Section 01100 does not state the contract's General Requirements would not establish that Section 15950 controls over Section 01100. Rather, it would leave a contradiction that cannot be resolved by the contract's order of precedence term.

Assuming that the order of precedence provision does not resolve the conflict between Section 01100 and Section 15950, the Division argues that under the ordinary rules of contract interpretation, the contract should be interpreted to include air balancing. The Division argues that reading the contract as a whole, a knowledgeable person would conclude that air balancing on all floors is required.[15] Silver Bow responds that reading a contract as a whole may resolve ambiguities, but it does not resolve a direct contradiction in terms, such as exists in this case.

Because the order of precedence clause controls, it is not necessary to decide whose interpretation would be applied if that clause were absent.

D.      Duty to Identify Ambiguity or Conflict Is Immaterial

On appeal, Silver Bow asserts that it was under no obligation to bring the conflict between Section 01100 and Section 15950 to the contracting officer's attention, because the order of precedence provision in its view resolved the apparent conflict. As for any

---

[14](...continued)
priority. In any event, the language at issue in Section 01100 plainly does not fall within the parameters of any of the subsequent items listed.

[15]      Apart from the familiar rule that contracts should be interpreted as a whole, the Division makes no specific reference to particular rules of contract interpretation.

issue with respect to whether Section 01100 should be deemed to contain the General Requirements, Silver Bow contends that it was under no obligation to bring that issue to the attention of the contracting officer because the problem was latent, rather than patent.

The Division asserts that Silver Bow had a duty to bring defects in the ITB terms to the attention of the contracting officer prior to submitting a bid, whether or not the Division was aware of those defects, and that the conflict between Section 01100 and Section 15950 was patent, rather than latent.

Whether Silver Bow did, or did not, have an obligation to bring conflicts or ambiguity in the contract documents to the attention of the contracting officer is immaterial to the question of how the contract should be interpreted. That question has been answered based on review of the contract language. That Silver Bow did not bring either matter (the conflict between Section 01100 and Section 15950, or the absence of expressly identified General Requirements) to the attention of the contracting officer prior to submitting a bid (or prior to contract award) played no role in that analysis.

E.    The Division Is Not Estopped

Silver Bow argues that the Division was under a duty (under its contract with the architect, under the public interest, and under a covenant to bidders) to review the draft ITB language provided by the architect (including the mechanical engineer's subcontracted contribution) for obvious errors[16] and that it breached this duty by failing to detect either the absence of an express General Requirements provision (which Silver Bow characterizes as a patent ambiguity) or the presence of the conflict between Section 01100 and Section 15950 (which Silver Bow characterizes as a patent

---

[16]    Silver Bow also mentions a duty arising under the contract between the Division and Silver Bow. Any duties the Division has that arise under the contract arose *after* the ITB was issued. They would have no bearing on the Division's duty with respect to issuing the ITB in a form free of obvious errors.

contradiction). By putting out the ITB, Silver Bow asserts, the Division represented that (1) the contract contained no obvious contradiction that could not be resolved by the order of precedence clause, and (2) the contract does not contain a General Requirements clause. Silver Bow contends that it reasonably relied on those implicit representations by submitting a bid based on a belief (induced by the Division's implicit representations) that air balancing was not required. Estoppel serves the public interest, Silver Bow contends, because it will encourage contracting agencies to be more careful in ensuring that the contracts they issue are free from obvious errors. The doctrine of quasi estoppel should be applied, Silver Bow contends, because it is unconscionable that the Division issued the contract in the form it did, after the mechanical engineer had informed the Division that his specifications (i.e., Section 15950) did not include air balancing.

Silver Bow's argument rests on the premise that because the Division had an obligation to inspect the proposed ITB documents for obvious errors, the Division implicitly represented that the documents as issued were absent any such errors. That is simply not a valid premise. If the Division made any implicit representation, it was that it had examined the contract documents, not that they were free of any obvious errors. Moreover, even if one were to accept the premise, it pertains to only one of the defects, namely, the patent contradiction between Section 01100 and Section 15950. The other purported defect in the contract was the absence of an expressly identified General Requirements clause. Silver Bow characterizes that as a latent ambiguity. As such it was not an obvious error, and thus not within the scope of the representation that Silver Bow contends was made, i.e., that the ITB was free of obvious errors. Accordingly, even under Silver Bow's analysis, the Division is not estopped to interpret the order of precedence clause as it did.

With respect to the assertion that Silver Bow reasonably relied on the Division's alleged implicit representation that the documents were error free, such reliance is

completely inconsistent with the order of precedence clause, which on its face exists in order to resolve contradictions in terms. The only fact mentioned in support of Silver Bow's assertion that it reasonably relied on the Division's alleged implicit representation is Mr. Adams' affidavit, which states that he relied on Section 15950: he says nothing about relying on a belief that the contract documents were error free and he does not state the reason he considered Section 15950 controlling, or even if he was aware of the contradictory language in Section 01100. In short, Mr. Adams' affidavit establishes only that Silver Bow relied on Section 15950, not that it had any reason to disregard the contradictory language in Section 01100, particularly when it was expressly called upon to examine the documents closely.

As for quasi estoppel, the essence of that doctrine is "the existence of facts and circumstances making the assertion of a different or inconsistent position unconscionable."[17] In this case, the Division has not changed its position; rather the contracting officer and the mechanical engineer had different understandings of what the project entailed. The contracting officer has consistently asserted that air balancing was required, and Section 01100 included language to that effect. The contradictory language in Section 15950 was patent and equally apparent to either party. In that light, and in light of the specific language in the ITB project description, it is not unconscionable that Silver Bow be held to the reading required by the order of precedence clause, even though the Division's error created the contradictory terms.

## IV. Conclusion

The central issue in this case is whether language in Section 01100 describing the scope of work takes precedence over Section 15950. If the language in Section 01100

---

[17] *Jamison v. Consolidated Utilities*, 576 P.2d 97, 102 (Alaska 1978).

is part of the General Requirements, as defined in Section 00700, then Section 01100 controls.

The contract is not reasonably susceptible of the reading proposed by Silver Bow, which is that because there is no provision in the contract labeled General Requirements, the contract contains no General Requirements at all. Rather, the definition of General Requirements is a functional one, and the contract is reasonably susceptible of the Division's interpretation, which is that the initial two digits of Section 01100 reflect the division number as used in the MasterFormat system, and that Section 01100 includes the contract's General Requirements as defined in Section 00700. Therefore, under the unambiguous terms of the order of precedence clause, Section 001100 controls Section 15950.

Silver Bow's appeal is denied.

Judicial review of this decision may be obtained by filing an appeal in the Alaska Superior Court within 30 days after the date of this decision.

DATED 7/9/13     /s/ Patrick J. Kemp, P.E.
            Commissioner
            Department of Transportation and Public Facilities

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
FIRST JUDICIAL DISTRICT AT JUNEAU

| | | |
|---|---|---|
| SILVERBOW CONSTRUCTION, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALASKA DEPARTMENT OF | ) | |
| ADMINISTRATION, DIVISION OF | ) | |
| GENERAL SERVICES, | ) | |
| | ) | |
| Appellee | ) | |
| _____ | ) | Case No. 1JU-13-792 CI |

**ORDER DENYING APPEAL**[*]

## I.  INTRODUCTION

Silverbow Construction Co. ("Silverbow")[1] appeals the final administrative decision of the Commissioner of Transportation and Public Facilities.[2]  In 2010 the Division of General Services ("the Division") awarded Silverbow a contract for the replacement of a rooftop air handler and associated canopy.  After Silverbow installed the air handler the Division asserted that Silverbow was also required to provide air

---

[*]     This decision has been edited to remove internal record citations.

[1]     In the motion practice, the Division of General Services uses the spelling of the Appellant's business name as found on both its Alaska business license and the subject contract: "Silver Bow Construction Co."  However, this court will follow the spelling used by Appellant in its motion practice, which is consistent with the spelling used by this court in previous orders: "Silverbow Construction Co."

[2]     The final decision was a revised version of the proposed decision issued by the Alaska Department of Administration, Office of Administrative Hearings ("OAH").

balancing services on each of the eight floors of the building served by the air handler. The contract contains an internal contradiction regarding air balancing: while one provision of the contract states that air balancing is included within the scope of work, another provision of the contract specifically states that air balancing is not included. The proposed decision issued by the Alaska Department of Administration, Office of Administrative Hearings ("OAH") and the Commissioner's Revised Decision both determined that under the contract's order of precedence clause, the portion of the contract which stated that air balancing was included within the scope of work controlled. Therefore, Silverbow was contractually obligated to perform the air balancing work.

Silverbow argues four claims on appeal: (1) under the order of precedence, the technical specifications section controls; (2) if the contract is ambiguous, then under the ordinary rules of contract interpretation, the contract should be interpreted in Silverbow's favor; (3) the Division had a duty to review the contract for any obvious contradictions between contract provisions; and (4) the Division should be estopped. For the following reasons, the court upholds the Commissioner's decision and denies Silverbow's appeal.

## II.    FACTS AND PROCEEDINGS

In 2006 Jensen, Yorba, and Lott ("JYL"), an architectural firm, entered into a contract with the Division to provide architectural and engineering services for a number of future projects, including the air handler project at the Court Plaza Building in Juneau. An air handler system is an air system, usually installed on a building's roof, which brings fresh air into a building, pre-heats it during the winter, and pre-cools it during the summer. The air is then distributed into the building's various thermal zones through a system of enclosed ductwork and variable air volume ("VAV") boxes. The function of the VAV boxes is to control the volume of air flowing into the building's thermal zones. The VAV boxes, and ductwork system to which the VAV boxes are connected, are

enclosed in the building's ceiling. The new heat recovery ventilation system was to utilize the existing ductwork and VAV boxes from the original HRV system that was being replaced. Murray and Associates ("Murray"), a mechanical engineering firm under a subcontract with JYL, assisted in the preparation of the technical specifications for the mechanical portion of the work.

The issue of air balancing for the project first arose in early July 2010 before the contract went out to bid. During the Division's pre-solicitation review of the contract specifications, the Division informed JYL that "it will be necessary to conduct air balancing on each of the 8 floors after the air handler is installed and operational." JYL forwarded the information to Murray who responded that in order to incorporate air balancing into the project it needed to be included in the plans. Following this advice, the Division prepared and included a full set of plans in the bid documents showing the location of the VAV boxes on each of the eight floors and prepared and included information on the target air volume ranges for each of the VAV boxes on each floor. Dan Aicher, the contracting officer, drafted language for Section 01100 that included air balancing in the project.

On July 6, 2010, the Division issued a public notice of the availability of an invitation to bid on the air handler contract. The description of the work required for the project included a provision stating: "[a]fter the new air handler unit is installed, the contractor shall conduct air balancing of the air flows on each of the eight floors within the building." The Division's official invitation for bids, issued the same day, included similar language. The invitation for bids also included a copy of the proposed contract, which contained a description of the work to be performed in Section 01100 Paragraph 1.6 entitled "Work Phases" which outlined two phases of work, with "Phase Two" including the air balancing of all eight floors.

The contract explains that its various documents are organized according to the "MasterFormat" numbering system, a standardized construction contract format. The MasterFormat is the standard format for Department of Administration construction contracts. Under the Construction Specification Institute's MasterFormat indexing system, the General Requirements are indexed as Division 01 and the Mechanical provisions are indexed as Division 15.

Additionally, the contract defines "General Requirements" as "[s]ections of Division 1 of the Specifications that contain administrative and procedural requirements as well as requirements for temporary facilities applying to Specifications in Divisions 2 through 16" and defines "Specifications" as "[t]hose portions of the Contract Documents consisting of written technical descriptions of materials, equipment, construction systems, standards and workmanship as applied to the Work and certain administrative and procedural details applicable thereto."

The air handler contract also included an order of precedence which reads:

> When conflicts[,] errors, or discrepancies within the Contract Documents exist, the order of precedence from most governing to least governing will be as follows:
>
> - Contents of Addenda
> - Supplementary Conditions
> - General Conditions
> - General Requirements
> - Technical Specifications
> - Drawings
> - Recorded dimensions will govern over scaled dimensions
> - Large scale details over small-scale details
> - Schedules over plans
> - Architectural drawings over structural drawings Structural drawings over mechanical and electrical drawings

On July 29, 2010, Silverbow submitted a bid, which was based upon Section 01100 and the contract documents. Silverbow was the lowest bidder and on August 24, 2010, the Division awarded the contract to Silverbow and authorized Silverbow to proceed with construction. In May 2011 Silverbow sought inspections of completed work described in Section 01100's Phase One (installation of the air handler unit, repair of the roof membrane, etc.). Murray found the work to be substantially completed and noted that air balancing "was not included in the original project scope of work." Concurrent with the substantial completion inspections for Phase 1 of the contract, Silverbow sought a change order for an additional payment of $38,298 to perform the work described in Section 01100's Phase Two.

The Division denied Silverbow's request for a change order. The Division alleges that it was at this point that it came to the Division's attention that there was an "editing oversight" which resulted in a contradictory term being included in the contract. In the contract's Section 15950 specifications for the testing, adjusting, and balancing of the roof top air handler, the contract stated that: "[b]alancing of individual floor ventilation rates including grilles and diffusers is *not* included in the Work."[3] Silverbow alleged that under the contract's order of precedence, the technical specification found "in Section 15950 controlled and that Silverbow reasonably relied on Section 15950 in forming their bid. On October 12, 2011, Silverbow filed a contract claim under AS 36.30.620 requesting that the final payment of $54,943 owed to it be paid together with interest dating from May 11, 2011.

Mr. Aicher, the Division's contracting officer for the air balancing contract, resigned his position on October 12, 2011, the same day that Silverbow filed their contract claim. On January 10, 2012, the new contracting officer rejected all of

---

[3]  (Emphasis added.)

Silverbow's arguments. On January 24, 2012, Silverbow appealed the contracting officer's decision to the Commissioner of Administration who transferred the appeal to the Office of Administrative Hearings. On May 9, 2012, the administrative law judge issued a written "Proposed Decision." The "Proposed Decision" held that the contract did have a "General Requirements" section, which included Section 01100, and therefore, air balancing was required by the contract. The administrative judge also noted that since the conflict between the two contract provisions is irreconcilable, "[i]f the Order of Precedence did not control, therefore, the contract would be interpreted to not include air balancing."

The Division filed a "Proposal for Action" to delete this language together with two paragraphs. The Alaska Department of Transportation concurred with the Division's Proposal for Action, removed Silverbow's appeal from the jurisdiction of the Office of Administrative Hearings, and issued its own "Revised Decision" without the above language. The Revised Decision was issued and signed by the Commissioner of Transportation and Public Facilities on July 9, 2013. The Commissioner held that the order of precedence in the contract should be interpreted in favor of the Division and that the rules of estoppel did not apply to this case. Silverbow appealed the Commissioner's decision to this court on August 5, 2013.

## III. DISCUSSION

The court applies its "independent judgment to questions of law, including contract interpretation, adopting the rule of law most persuasive in light of precedent, reason, and policy."[4] Additionally, "[t]he applicability of estoppel principles to a

---

[4] *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 382 (Alaska 2004).

particular set of facts is a legal question over which" the court exercises "independent review."[5]

## A.    Contract Claims

Construction contracts are particularly complex and often comprise a number of documents such as drawings, specifications, and permits. Construction contracts usually contain an order of precedence provision stating that conflicting language between the various contract documents will be resolved by giving preference to one document over another.[6] "The order of precedence clause should be used only where the performance called for by the contract cannot be determined by reviewing all the provisions of the contract."[7] A contractor may be properly held to the terms of a public works contract when the contract, read as a whole and giving proper priority to its different parts, is sufficiently definite to inform a knowledgeable reader.[8]

Silverbow argues on appeal that: (1) under the order of precedence, the technical specifications section controls; and (2) if the contract is ambiguous, then under the ordinary rules of contract interpretation, the contract should be interpreted in Silverbow's favor. The Division responds that: (1) the contradictory terms of the contract can be resolved by the contract's order of precedence, which gives priority to Section 01100; and (2) the contract should be resolved by the ordinary rules of contract interpretation, which interpret the contract as a whole and give meaning to the contract's terms.

The air handler contract contains an obvious contradiction. The summary section of the contract, Section 01100, states that air balancing is required by the contract. The

---

[5]     *Powers v. United Servs. Auto. Ass'n*, 6 P.3d 294, 297 (Alaska 2000).

[6]     Bruner & O'Connor on Construction Law § 3:40 at 461 (rev. ed. 2013).

[7]     *Lakloey, Inc. v. University of Alaska*, 2002 WL 1732561, *5 (Alaska 2002).

[8]     *Northern Timber Corp. v. State*, 927 P.2d 1281, 1288 (Alaska I 996).

technical specifications section of the contract, Section 15950, says that air balancing is not included. It is obvious that these contradictory provisions cannot both be performed.

In resolving this discrepancy, the court first looks to the contract's order of precedence, which provides that "General Requirements" take precedence over "Technical Specifications." First, aside from the Division 00 "General Conditions," the titles of the various contract documents are not identical to the functional classifications listed in the order of precedence. Notably, none of the contract documents are titled either "General Requirements" or "Technical Specifications." Rather, the contract's functional classifications are described in the definitions and terms. The contract defines "General Requirements" and "Specifications" by their function. The court finds that the work and phasing requirements of Section 01100 meet the definition of "General Requirements" and that the overview of the rooftop unit testing, adjusting, and balancing requirements of Section 15950 meets the definition of "Specifications." Thus, using the contract's definitions of its own terms, the order of precedence requires that the general requirement of Section 01100 governs the actions of the parties over the technical specification of Section 15950.

In addition to resolving the discrepancy through the use of the contract's definitions, the contract provides that its various documents are organized according to a standardized construction contract format, the "MasterFormat" numbering system. Under the Construction Specification Institute's MasterFormat indexing system, the General Requirements are indexed as Division 01 and the Mechanical provisions are indexed as Division 15. In the air handler contract, Section 01100 Paragraph 1.6 entitled "Work Phases" outlined two phases of work, with "Phase Two" including the air balancing of all eight floors with the contrary provision found at Section 15950. Since Division 01 General Requirements take precedence over Division 15 Mechanical

specifications, the contract's order of precedence requires the discrepancy be resolved in favor of Section 01100.

For these reasons, the terms of the contract are sufficiently definite to inform a knowledgeable reader. The "Work Phases" description in the Division 01 specifications meets the contract's definition of a general requirement, which takes precedence over the contradictory term in the Division 15 technical specifications. Therefore, Silverbow is contractually bound to perform the work described as Phase Two of the contract. As such, the court will not consider whether the contradictory terms of the contract can be resolved by ordinary rules of contract interpretation.

### B.      Estoppel and Quasi-Estoppel

"[E]stoppel may apply against the government and in favor of a private party if four elements are present: (1) the governmental body asserts a position by conduct or words; (2) the private party acts in reasonable reliance thereon; (3) the private party suffers resulting prejudice; and (4) the estoppel serves the interest of justice so as to limit public injury."[9]

Quasi-estoppel "precludes a party from taking a position inconsistent with one he has previously taken where circumstances render assertion of the second position unconscionable."[10] Quasi-estoppel "appeals to the conscience of the court to prevent injustice" and "does not require ignorance or reliance as essential elements."[11] However,

---

[9]      *Crum v. Stalnaker*, 936 P.2d 1254, 1256 (Alaska 1997) (citing *Wassink v. Hawkins*, 763 P.2d 971, 975 (Alaska 1988)).

[10]      *Jamison v. Consolidated Utilities, Inc.*, 576 P.2d 97, 102 (Alaska 1978).

[11]      *Id.*

to assert quasi-estoppel, it is necessary "that any representation made to the party claiming quasi-estoppel must have been based with full knowledge of the facts."[12]

Silverbow first argues that the Division had a duty to review the contract documents for any obvious omissions or contradictions between contract provisions and had a duty to provide clarifying language. Silverbow further argues that the Division breached this duty by failing to detect either the absence of an express "General Requirements" provision or the presence of the conflict between Section 01100 and Section 15950. Silverbow asserts that by putting the contract out to bid, the Division fairly implied to bidders that contradictions in the contract are easily resolved by applying the order of precedence and that the contract did not include a "General Requirements" clause. Silverbow argues that because it reasonably relied on this implication in forming its bid, the Division should be estopped. Silverbow also contends that the doctrine of quasi-estoppel should be applied because it is unconscionable for the Division to issue a contract in the form that it did after Murray informed the Division that his specifications did not include air balancing. The Division first responds that no duty exists in law requiring the Division to create an error free contract and alternately, that Silverbow had a duty to disclose the presence of the contradictory terms during the bidding process. Next, the Division argues that it cannot be estopped from enforcing the terms of the contract.

Silverbow's argument rests on the premise that because the Division had a duty to inspect the proposed documents for obvious errors, the Division implicitly represented that the documents as issued were absent any such errors. First, the court finds that no such duty exists in law. Second, the assertion that Silverbow reasonably relied on the Division's alleged implicit representation that the documents were free of obvious errors

---

[12] *Id*.

is inconsistent with the order of precedence clause which exists in order to resolve such contradictions. Furthermore, the contract included a clause mentioning that the bidder had a duty to notify the Division of any contradictions discovered in the contract. Therefore, the court finds that the Division is not estopped from interpreting the order of precedence as it did.

As for quasi-estoppel, Silverbow relies on an email exchange made during the creation of the contract requirements for Phase Two of the work as the primary support for its argument that the Division had actual knowledge of the conflicting contract terms prior to the release of the bid documents. In the email exchange, Murray stated that language in the draft technical specifications only required balancing of the RTU fan itself; Murray never mentioned that the specifications also explicitly stated that air balancing was not included in the work.[13] Contrary to Silverbow's assertion, this does not demonstrate actual knowledge on the part of the Division of the conflicting term in the contract. Because there is no evidence that the Division had actual knowledge of the conflicting term, quasi-estoppel does not apply.

Furthermore, for quasi-estoppel to apply, there must be evidence to show that the Division took a position inconsistent with one it had previously taken. Here, the Division never changed its position: rather the contracting officer and the subcontractor had different understandings of what the project entailed.[14] The contracting officer

---

[13] "The RTU air volume is specified to be same as the existing unit. I did not have any language in the project to balance anything other than the RTU fan itself. If that is to be included in the project then there needs to be plans showing where the VAV boxes are and what air volumes they are to be balanced to."

[14] Section 2.1.1 of the General Conditions states that "[t]he Contracting Officer alone, shall have the power to bind the DEPARTMENT and to exercise the rights, responsibilities, authorities and functions vested in the Contracting Officer by the

(continued...)

consistently asserted that air balancing was included in the scope of the work and included language in Section 01100 to that effect. For these reasons, the court finds that it is not unconscionable that Silverbow is held to the reading required by the order of precedence clause even though the Division's error created the contradictory terms. Therefore, on the issues of estoppel and quasi-estoppel, the court affirms the Commissioner's Revised Decision.

## IV. CONCLUSION

For the reasons stated above, the court affirms the Commissioner's decision. As such, Silverbow's appeal is DENIED.

Entered at Juneau, Alaska this 10th day of February, 2015.


/s/Louis James Menendez
Superior Court Judge

---

[14](...continued)
Contract Documents, except that the Contracting Officer shall have the right to designate in writing authorized representatives to act for him. . . . . [A] copy of each document vesting additional authority in or removing that authority from an authorized representative or designating an additional authorized representative shall be furnished to the CONTRACTOR."